# IT UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:17-cv-11816 |
| | ) | |
| RAYTHEON COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## RAYTHEON COMPANY'S MOTION TO DISMISS

TO THE HONORABLE NATHANIEL M. GORTON:

Defendant Raytheon Company ("Raytheon") submits this memorandum in support of its motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss with prejudice the complaint filed in this action by Plaintiff United States of America, acting at the request of the United States Navy (the "Navy").

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STANDARD FOR MOTION ............................................................................................. 4

ARGUMENT AND AUTHORITIES ................................................................................. 5

I.   *RES JUDICATA* BARS THIS DUPLICATIVE ACTION ................................. 5

    A.   The 1993 Dismissal with Prejudice Was a Final Judgment on the Merits ............. 5

    B.   The Navy's Claim Here is "Sufficiently Identical" to the Claims It Asserted and Dismissed with Prejudice in the Prior Suit ....................................................... 6

II.   U.S. EPA'S SETTLEMENT WITH THE NAVY 18 YEARS AGO ELIMINATED ANY RIGHT OF ACTION BY THE NAVY UNDER CERCLA SECTION 107 ........... 9

    A.   The Navy Cannot Disavow Its Administrative Settlement with U.S. EPA to Circumvent the Three-Year Statute of Limitations ............................................... 10

    B.   The Federal Facility Agreement Is an Administrative Settlement........................ 12

III.   THE NAVY'S PURPORTED CLAIM UNDER SECTION 107 IS TIME BARRED..... 15

CONCLUSION................................................................................................................... 20

# EXHIBITS

A. <u>Affidavit of Michelle K. Buchanan with attached Certified Court Records from *Town of Bedford v. Raytheon Co.*</u>
   1. Complaint and Demand for Jury Trial, Oct 16, 1989.
   2. Cross-Claims of U.S. Department of the Air Force and U.S. Department of the Navy Against Defendants Massachusetts Port Authority and Raytheon Company, Apr. 12, 1991.
   3. Stipulation of Dismissal, Mar. 31, 1993.
   4. Consent Judgment, Mar. 31, 1993.
   5. Answer of Defendants U.S. Department of the Air Force and U.S. Department of the Navy, Sept. 28, 1990.
   6. Monthly Report of the Navy Concerning Progress of Supplemental Remedial Investigation at NWIRP as of Jan. 31, 1993.
   7. Answer of Raytheon to Cross-Claims of Air Force and Navy, July 16, 1991.
   8. Answer of Air Force and Navy to Cross-Claims of Raytheon, October 7, 1991.

B. <u>Affidavit of Nicola J. Smith with attached Public Records from the United States Navy or Town of Bedford, Massachusetts</u>
   1. Settlement Agreement and Releases, Jan. 29, 1993.
   2. Agreement Between Town of Bedford and Department of the Navy Regarding Site Y, Jan. 29, 1993.
   3. Settlement Agreement Between the Department of the Navy and the Department of the Air Force and Raytheon Company, Jan. 29, 1993
   4. Federal Facility Agreement under CERCLA Sections 104, 120, and 122, Sept. 14, 1999.
   5. Final Five-Year Review – Naval Weapons Industrial Reserve Plant, Sept. 2014.
   6. Record of Decision: Site 3 – Chlorinated Solvent Groundwater Plume NWIRP, Sept. 2010.
   7. Interim Remedial Design Pump and Treat Evaluation NWIRP, Feb. 27, 1992.
   8. EPA Letter regarding the Federal Facility Agreement National Priorities List Site to Include NWIRP Bedford MA, Feb. 1, 2000.
   9. EPA Letter regarding Federal Facility Agreement for Naval Weapons Industrial Reserve Plant National Priority List Superfund Site, Jan. 11, 1999.
   10. Short Term Measure Report NWIRP Bedford, Apr. 1993. (Excerpts)
   11. Short Term Measure Design Plan of Action/Work Plan, May 1992. (Excerpts)

# INTRODUCTION

In this lawsuit, the Navy seeks to resurrect claims that were dismissed with prejudice more than two decades ago by this very Court after years of complex environmental litigation. The Navy's present action is not only barred under the fundamental principle of *res judicata*, but is also improperly brought as a claim for cost recovery, rather than contribution, under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). The claim is untimely, in any event, under CERCLA's statute of limitations.

At a time of rising tensions in Korea and around the world, the Navy engaged Raytheon beginning in 1952 to develop radar systems and guided-missile technology for the Navy at a 46-acre military installation the Navy owned or controlled in Bedford, Massachusetts.[1] The Navy's Bedford facility, known as the Naval Weapons Industrial Reserve Plant ("NWIRP"), was integral to the country's national defense structure for almost half a century. The Navy's strategic alliance with Raytheon at NWIRP continued beyond the Cold War until the plant closed in 2000.[2]

In 1989, the Town of Bedford filed suit in this Court against the Navy, Raytheon, and others, alleging that the NWIRP facility was a potential source of chlorinated solvents that had reached or threatened the town's water wells (the "*Bedford* Litigation").[3] Around the same time, according to the Navy's complaint in the present case, the Navy identified chlorinated solvents in the groundwater under the northern portion of its NWIRP facility.[4] The town's 1989 lawsuit sought injunctive and declaratory relief as well as cost recovery from both the Navy and

---

[1] *See* Doc. 1, Navy's Compl. ¶¶ 10–13.

[2] *See id*.

[3] Ex. A-1, Bedford's Compl. ¶¶ 67–71, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Oct. 16, 1989).

[4] Doc. 1, Navy's Compl. ¶ 19; *see also* Ex. A-1, *supra* note 3, at ¶ 71 (alleging "[g]roundwater flows from the NWIRP facility in a northerly direction towards the Bedford . . . wells").

Raytheon under CERCLA and the Resource Conservation and Recovery Act ("RCRA") to address that chlorinated-solvent contamination.[5]  In turn, the Navy and Raytheon filed cross-claims against each other based on their respective involvement at NWIRP.[6]

After almost four years of extensive discovery and motion practice, this Court entered a Consent Judgment in March 1993—more than 24 years ago—dismissing the *Bedford* Litigation, including the Navy's cross-claims against Raytheon, with prejudice.[7]  Having fully and finally resolved all its claims against Raytheon, the Navy continued to engage Raytheon for the next seven years as its contractor to complete its defense work at the NWIRP installation.  At the same time, the Navy continued the remediation it began at NWIRP in 1984, including additional remediation it separately agreed to perform as part of its settlement in the *Bedford* Litigation.[8]

That additional remediation included the installation of a network of no fewer than 23 groundwater wells and an on-site treatment plant to extract and treat the previously detected chlorinated-solvent plume and prevent it from migrating from NWIRP to the town's wellfield.[9]  Now, more than 17 years after its defense mission at NWIRP ended, the Navy seeks payment from Raytheon for that same chlorinated-solvent remediation, which the Navy alone agreed to

---

[5] *Id.* ¶¶ 91–127.

[6] Ex. A-2, Navy's Cross-Claims ¶¶ 30–39, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Apr. 12, 1991); Ex. A-7, Raytheon's Cross-Claims ¶¶ 11–37, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Apr. 12, 1991).

[7] Ex. A-4, Consent Judgment, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Mar. 31, 1993); A-3, Stipulation of Dismissal of Cross-Claims, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Mar. 31, 1993).

[8] Ex. A-5, Navy's Answer ¶ 64, *Town of Bedford v. Raytheon Co., et al.*, No. 89-2313-WD (D. Mass. Mar. 31, 1993) ("The Navy . . . states that since 1984 it has been diligently conducting remedial activities at the NWIRP facility pursuant to [CERCLA]"); Ex. B-2, Agreement Between Town of Bedford and Navy, Jan. 29, 1993, at ¶ 1.

[9] Doc. 1, Navy's Compl. ¶¶ 1, 22–23; *see also* Ex. B-6, Record of Decision: Site 3 – Chlorinated Solvent Groundwater Plume NWIRP, Sept. 2010, at 26; Ex. B-2, Federal Facility Agreement, Sept. 1999, at 15 ¶ 6.9.

perform in settlement of the *Bedford* Litigation.  Neither the passage of nearly a quarter century since that case was dismissed with prejudice nor any intervening event gives the Navy a right to re-litigate its purported environmental claim against Raytheon now.

Four years after the Navy began constructing its pump-and-treat remediation system in 1995,[10] the Navy negotiated a separate settlement, in the form of a Federal Facility Agreement, with the United States Environmental Protection Agency ("U.S. EPA"), by which the Navy committed to complete the ongoing remediation under U.S. EPA oversight.[11]  Even if it had not already foreclosed any further CERCLA claim against Raytheon by agreeing to this Court's dismissal of the *Bedford* Litigation and the Navy's cross-claims against Raytheon with prejudice, the Navy—like any other liable party that settles with U.S. EPA—would be limited to a contribution claim under CERCLA Section 113, rather than a joint-and-several-liability claim under Section 107.  42 U.S.C. §§ 9613, 9607 (2012).

The three-year limitations period for any contribution claim began running from the effective date of the Navy's settlement with U.S. EPA in 2000 and thus expired no later than 2003.  And even if the Navy ever had a Section 107 cost-recovery claim for the groundwater remediation system it started constructing in 1995, CERCLA's six-year limitation period for recovery of remedial-action costs would have lapsed by 2001.[12]  For each of these reasons, the Navy's duplicative and untimely suit against Raytheon should be dismissed with prejudice.

---

[10] Doc. 1, Navy's Compl. ¶ 22.

[11] Ex. B-4, *supra* note 9.

[12] Raytheon entered a tolling agreement with the Navy (but not the United States at large) that suspended the running of the statute of limitations from September 1, 2016 through September 1, 2017.  That agreement has no bearing on this motion, because the statute of limitations expired long before the agreement became effective.

**STANDARD FOR MOTION**

On a motion under Rule 12(b)(6), a complaint must be dismissed if it does not allege

sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 667 (2009). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)). "In an appropriate case, an affirmative defense may be adjudicated

on a motion to dismiss for failure to state a claim" and "[t]he affirmative defense of *res judicata*

is no exception." *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 16 (1st Cir. 2003).

When deciding a Rule 12(b)(6) motion, a court must consider "the complaint, the

documents (if any) incorporated therein, matters of public record, and other matters of which the

court may take judicial notice." *Id.* Moreover, the "Court's review is more expansive . . . where

a motion to dismiss is premised on a defense of *res judicata* . . . . In such cases, the Court may

also take into account the record in the original action." *Zoll Med. Corp. v. Phillips Elecs. N.*

*Am. Corp.,* No. CIV.A. 14-10029-NMG, 2014 WL 1428146 at *3 (D. Mass Apr. 11, 2014).

Raytheon requests that the Court take judicial notice of the documents in the appendix,

including documents from this Court's file in the earlier *Bedford* Litigation and other

governmental records maintained by the Navy and the Town of Bedford, all of which are matters

of public record. *See Hosseini v. Capital One, N.A.,* 217 F. Supp. 3d 441, 445 (D. Mass 2016)

(court may rely on matters of public record, including court records, in ruling on a Rule 12(b)(6)

motion); *Village of DePue v. Viacom Int'l*, 713 F. Supp. 2d 774 (C.D. Ill. 2010) (dismissing

environmental claims as untimely based on fact sheets and reports from public agency).

## ARGUMENT AND AUTHORITIES

## I.     *RES JUDICATA* BARS THIS DUPLICATIVE ACTION

The doctrine of *res judicata* precludes a suit when three criteria are met: "(1) there is a final judgment on the merits in an earlier action, (2) 'sufficient identity' exists between the parties in the earlier and later suits, and (3) 'sufficient identity' exists between the causes of action in the two suits." *United States v. Cunan*, 156 F.3d 110, 114 (1st Cir. 1998). Furthermore, *res judicata* applies not only with respect to claims that were asserted in the original action, but also to related claims that could have been raised in that suit. *Steele v. Ricigliano*, 789 F. Supp. 2d 245, 249 (D. Mass. 2011). The claims the Navy asserted against Raytheon in the earlier *Bedford* Litigation meet all three elements for *res judicata*. As detailed below, dismissal of the Navy's repetitive claim is thus required.

### A.     *The 1993 Dismissal with Prejudice Was a Final Judgment on the Merits*

The First Circuit has held that a voluntary dismissal with prejudice is a final judgment for purposes of *res judicata* preclusion. *Cunan*, 156 F.3d at 114. This is true even if the dismissal is made in conjunction with a settlement. *Langton v. Hogan*, 71 F.3d 930, 935 (1st Cir. 1995); *Silva v. City of New Bedford*, 677 F. Supp. 2d 367, 369 (D. Mass. 2009). *Res judicata* also applies even if one party did not intend for the dismissal to bar certain claims. *United States v. Decato*, No. 93-10047-WGY, 1997 WL 136339, at *3 (D. Mass. Feb. 20, 1997). Parties must expressly reserve claims if they wish to exclude them from the effect of *res judicata*. *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576–77 (Fed. Cir. 1989).

In neither the voluntary dismissal with prejudice of the Navy's earlier claims nor the settlement agreement between the Navy and Raytheon did the Navy preserve any claims

concerning NWIRP or its remediation.[13]  The only claims that were preserved as part of that dismissal were those between two other parties, the Air Force and Massport.[14]  The Navy alone agreed to undertake the chlorinated-solvent investigation and remediation for which it now seeks recovery from Raytheon.[15]  After four years of prior litigation that ended with an agreed order of dismissal with prejudice, the Navy's renewed claim simply cannot stand 24 years later.

### B.   The Navy's Claim Here is "Sufficiently Identical" to Claims It Asserted and Dismissed with Prejudice in the Prior Suit

In determining whether the original and later claims have "sufficient identity" for *res judicata* preclusion, the First Circuit has adopted the "broad 'transactional' approach," which embraces "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *United States v. Cunan*, 156 F.3d 110, 114 (1st Cir. 1998).  Thus, "sufficient identity" of claims exists when they arise from the same transaction or a common nucleus of operative fact.  *Id.* at 114, 116; *Hudges v. McMenamon*, 379 F. Supp. 2d 75, 79 (D. Mass. 2005).

In *Johnson v. SCA Disposal Services, Inc.*, 931 F.2d 970 (1st Cir. 1991), for example, the First Circuit held that a judgment awarding lost revenue damages in an action for negligent misrepresentation precluded the plaintiff from seeking additional damages for hazardous waste removal in a later suit under environmental law.  931 F.2d at 974–75; *accord Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 43–44 (4th Cir. 1990).  Because the two actions arose out of the same property

---

[13] Ex. A-3, *supra* note 7; Ex. B-3, Settlement Agreement Between Navy, Air Force, and Raytheon, Jan. 29, 1993. The agreement did, however, set forth a detailed contractual procedure for potential remediation of an area called "Site Y." *Id.*  The Navy has made no claim against Raytheon under that agreement with respect to "Site Y."

[14] Ex. A-4, *supra* note 7.

[15] Ex. B-2, *supra* note 8, at ¶ 1.

transaction and shared a common nucleus of operative facts, the First Circuit found that *res judicata* applied.  *Johnson,* 931 F.2d at 977.

The application of *res judicata* here is even more compelling, because the *Bedford* Litigation, like this suit, involved CERCLA claims, the same facility, and same alleged contamination.  The remediation of chlorinated-solvent contamination from the NWIRP facility was central to the Town of Bedford's claims against the Navy and Raytheon and to the Navy's cross-claims against Raytheon in the prior litigation.  The town alleged that both the Navy and Raytheon were liable for the "release or threatened release" of these volatile organic compounds ("VOCs") from the Navy's NWIRP installation.[16]

The town sought both damages under CERCLA and injunctive relief under RCRA, as well as a declaratory judgment for future damages and remediation of contamination allegedly migrating from the NWIRP facility.[17]  Moreover, the Navy asserted several cross-claims, including a CERCLA contribution claim, against Raytheon.[18]  In addition, the Navy filed a cross-claim under facilities contracts governing Raytheon's defense work at the plant.[19]  To avoid all doubt that it was bringing all claims it had with respect to the contamination and reserving no claims, the Navy also sought a declaratory judgment against Raytheon as to any "judgment or other relief which Bedford may obtain against the Navy in this action."[20]

As part of its global settlement of the *Bedford* Litigation, the Navy separately agreed with

---

[16] Ex. A-1, *supra* note 3, at ¶ 67 ("Navy and Raytheon have . . . disposed of hazardous substances and other pollutants at the NWIRP facility including . . . volatile organic compounds . . . .").

[17] *Id.* ¶¶ 67–71.

[18] Ex. A-2, *supra* note 6, at ¶¶ 35–36.

[19] *Id.* ¶¶ 30–34.

[20] *Id.* ¶ 37–39.

7

the Town of Bedford that the Navy itself would conduct and complete the ongoing remedial investigation and perform a feasibility study for remediation of its NWIRP facility.[21]  The Navy also specifically agreed to issue a Record of Decision ("ROD") for the selected remedy, with input from the Town of Bedford regarding the scope of that work.[22]

As alleged in the Navy's complaint in this litigation, the Navy issued its ROD in 2010 for the chlorinated-solvent contamination at issue here, adopting the existing pump-and-treat system the Navy began installing in 1995 as the chief component of the long-term remedy.[23]  Moreover, that remedial system was designed to prevent migration of chlorinated-solvents in groundwater from NWIRP toward the town's wellfield.[24]  The system, which the Navy implemented in accordance with its separate settlement obligations to the Town of Bedford, thus addressed not only the very concern that led the town to file its suit against the Navy and Raytheon in the first place, but also the Navy's claim for indemnity, contribution, or cost recovery from Raytheon.

There is no question that the alleged chlorinated-solvent contamination at NWIRP was central to the *Bedford* Litigation.  In its answer in that prior lawsuit, the Navy acknowledged that "since 1984 it has been diligently conducting remedial activities at the NWIRP facility pursuant to [CERCLA], including a remedial investigation and feasibility study."[25]  The Navy's answer further expressed a commitment by the Navy to "ensure that remedial activities at the NWIRP continue until completed, and that the facility is remediated in accordance with federal

---

[21] Ex. B-2, *supra* note 8, at ¶ 1.

[22] *Id.*

[23] Ex. B-6, *supra* note 9, at 12.

[24] *See, e.g.,* Ex. B-4, *supra* note 9, at 15 ¶ 6.9; Ex. B-10, Navy, *Short Term Measure Report NWIRP Bedford,* Apr. 1993, at § 1.4.

[25] Ex. A-5, *supra* note 8, at ¶ 64.

standards."[26]  Further, by order of this Court in the prior suit, the Navy was required to file

monthly reports to the Court and the other parties regarding the progress of its ongoing remedial

investigation, which was of critical importance to the resolution of the case.[27]

The Navy cannot claim that it was unable to seek recovery in the prior litigation for the

work it allegedly began even before that lawsuit was filed.  *Cf. Am. Cyanamid Co. v. Capuano,*

381 F.3d 6, 17 (1st Cir. 2004).  In fact, the Navy was obligated to do so in response to

Raytheon's cross-claims against it in the *Bedford* Litigation.  *See* Fed. R. Civ. P. 13(a)

(compulsory counterclaims); *Rainbow Mgmt. Grp., Ltd. v. Atlantis Submarines Haw., L.P.*, 158

F.R.D. 656, 660 (D. Haw. 1994) (Co-parties become opposing parties within the meaning of Fed.

R. Civ. P. 13(a) after one such party pleads a cross-claim against the other).  Because all of the

Navy's claims were or could have been asserted in the prior suit involving the same

contamination, the Navy cannot now seek "a second bite at the very same apple."  *Cunan,* 156

F.3d at 116.  The transactional test for *res judicata* requires that the Navy's renewed claim

against Raytheon be dismissed with prejudice, just as its prior cross-claims were dismissed by

agreed order of this Court more than 24 years ago.

## II.    U.S. EPA'S SETTLEMENT WITH THE NAVY 18 YEARS AGO ELMINATED ANY RIGHT OF ACTION BY THE NAVY UNDER CERCLA SECTION 107

In addition to being barred by *res judicata*, the Navy's cost-recovery claim under

CERCLA Section 107 cannot stand in light of a settlement the Navy negotiated 18 years ago

with U.S. EPA to resolve the Navy's CERCLA liability for the NWIRP contamination.  The First

---

[26] *Id.*

[27] *E.g.,* Ex. A-6, Monthly Report of the Navy Concerning Progress of Supplemental Remedial Investigation at NWIRP as of Jan. 31, 1993, *Town of Bedford v. Raytheon Co., et al.,* No. 89-2313-WD (D. Mass. Mar. 31, 1993).

Circuit has long recognized that "CERCLA differentiates between 'action[s] for recovery of . . . costs' [under Section 107] and 'action[s] for contribution'" under Section 113. *United Techs. Corp. v. Browning-Ferris Indus.,* 33 F.3d 96, 99 (1st Cir. 1994) (holding that a liable party that settled with U.S. EPA, and thus gained a contribution right under Section 113, could not use the longer limitations period for cost-recovery under Section 107). As the First Circuit noted, "CERCLA's text indicates that contribution and cost recovery are distinct, non-overlapping anodynes." *Id.* at 103; *see also BASF Catalysts LLC v. United States,* 479 F. Supp. 2d 214, 223 (D. Mass. 2007) ("Controlling precedent indicates that § 107 and § 113 are separate remedies each having their own limitations period.").

Moreover, all seven of the other federal courts of appeal that have addressed the issue have held consistently that contribution under Section 113 is the exclusive remedy for parties, like the Navy here, that have resolved "some or all" of their CERCLA liability in an administrative settlement.[28] To hold otherwise would render Section 113 meaningless. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127–28 (2d Cir. 2010) (permitting settling parties to proceed under either section would "in effect nullify" Section 113 "and abrogate the requirements Congress placed on contribution claims.").

A. **The Navy Cannot Disavow Its Administrative Settlement with U.S. EPA to Circumvent the Three-Year Statute of Limitations**

The rules under CERCLA are no different for the Navy than for any other liable party. Section 120(a)(1) of CERCLA, relating to federal facilities such as NWIRP, provides explicitly

---

[28] *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127–28 (2d Cir. 2010); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010); *Hobart Corp. v. Waste Mgmt., Inc.*, 758 F.3d 757, 766 (6th Cir. 2014); *Bernstein v. Bankert*, 733 F.3d 190, 202 (7th Cir. 2013); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 603–04 (8th Cir. 2011); *Asarco, LLC v. Atl. Richfield Co.,* 866 F.3d 1108, 1124–25 (9th Cir. 2017); *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1236–37 (11th Cir. 2012).

that "[e]ach department, agency, and instrumentality of the United States . . . shall be subject to, and comply with, [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity . . . ."  42 U.S.C. § 9620(a)(1) (2012).

Given the importance of preserving the integrity of CERCLA's remedy structure, the United States filed numerous amicus briefs to encourage federal appellate courts to restrict liable parties in the same position as the Navy here from accessing Section 107.[29]  In each of these cases, the court agreed with the United States' reasoning, which is directly at odds with the government's attempt on behalf of the Navy to invoke Section 107 in the present litigation. Quite simply, the United States cannot have it both ways.

In the Sixth Circuit's *Hobart* appeal, for example, the United States observed that the settling parties "had every opportunity to bring a § 113(f) contribution claim against Defendants-Appellees but failed to do so in a timely manner" within three years of the settlement.  This "lack of diligence," the United States asserted, "is no reason to jeopardize the integrity of the CERCLA cleanup regime."[30]  The Navy's 18-year delay in pursuing its purported claim against Raytheon is even more pronounced.  Further, the interest in maintaining CERCLA's "delicately crafted incentive structure" for settlements and bringing "parties to the bargaining-and-clean-up table sooner rather than later" is no less important when the Navy resolves its strict liability

---

[29] United States' Brief as Amicus Curiae in Support of Defendants at 7-10, *Hobart Corp. v. Waste Mgmt., Inc.*, 758 F.3d 757 (6th Cir. 2014) (Nos. 13-3273, 13-3276), 2013 WL 6221237 (hereinafter "*Hobart* Brief"); Brief of United States as Amicus Curiae Supporting Appellant at 18–19, *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010) (No. 08-3843-cv(L), 08-4007-cv(XAP)), 2008 WL 10610074; Brief and Required Short Appendix for Cross Appellant, Appellee, and Amicus Curiae Supporting Defendants-Appellees United States at 69–70, *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014) (No. 13-2447 etc.), 2013 U.S. 7th Cir. Briefs LEXIS 337; Brief for United States as Amicus Curiae Supporting Appellee at 24, *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594 (8th Cir. 2011), 2010 U.S. 8th Cir. Briefs LEXIS 635.

[30] *Hobart* Brief, *supra* note 29, at 11–12.

11

under CERCLA than it is for any other settling party.  Because the Navy's claim under Section 107 is unauthorized and any claim under Section 113 would be time barred, this litigation should be dismissed with prejudice.  *See* 42 U.S.C. 9613(g)(3) (2012).

**B.     The Federal Facility Agreement Is an Administrative Settlement**

In finding that administrative settlements foreclose cost-recovery claims under Section 107, courts interpret the term "administrative settlement" broadly to include any agreement that resolves all or even some of a party's CERCLA liability, either through payment or commitments to perform remediation.  *E.g., Hobart,* 758 F.3d at 768.  Most recently, the Ninth Circuit held that an agreement resolves CERCLA liability, and thus makes contribution the exclusive remedy, if it "determines . . . compliance obligations with certainty and finality." *Asarco, LLC v. Atl. Richfield Co.,* 866 F.3d 1108, 1124–25 (9th Cir. 2017).

The Federal Facility Agreement the Navy entered into with U.S. EPA 18 years ago, complete with dispute-resolution and stipulated-penalty provisions, conclusively resolves the Navy's liability for all the remediation at issue here.  In both its heading and the very first paragraph, the agreement cites CERCLA Section 122 (42 U.S.C. § 9622)—the provision devoted specifically to settlements—as statutory authority for its execution.[31]  In fact, prior to entering the agreement, U.S. EPA initiated the "Special Notice" procedure for settlements under Section 122(e) and threatened the Navy with an administrative order if a settlement was not reached promptly.[32]  There can be no question, therefore, that the Federal Facility Agreement is exactly what it purports to be—a CERCLA administrative settlement.

---

[31] Ex. B-4, *supra* note 9, at 1.

[32] Ex. B-9, Letter from U.S. EPA to Navy, Jan. 11, 1999.

In *Responsible Envtl. Solutions Alliance v. Waste Management, Inc.,* 493 F. Supp. 2d

1017 (S.D. Ohio 2007), the court found that even an administrative order on consent ("AOC")

was a settlement for purposes of CERCLA Section 113.  In so holding, the court found it

dispositive that the caption of the AOC, like the Navy's Federal Facility Agreement here, stated

that it was issued in accordance with CERCLA Section 122.  The court noted that:

> [T]he AOC entered into herein does not use the word "settlement."  That does not,
> however, convince the Court that the AOC is not a settlement, as that term is used
> in § 113(f)(3)(B).  Throughout the AOC, there are references to the parties
> agreeing and the document is referred to as an agreement.  Among other
> definitions, the . . . Oxford English Dictionary defines "settle" as "[t]o fix by
> mutual agreement."

*Responsible Envtl. Solutions,* 493 F. Supp. 2d at 1023 n.5 (citation omitted).

The Federal Facility Agreement at issue here quite clearly fixed the Navy's obligations

by mutual agreement.  The 87-page agreement establishes detailed compliance obligations the

Navy must meet, along with additional requirements set forth in various appendices.  By its

terms, the agreement "extends to the entire Site" and provides that "[a]ny Response Action in

progress on the effective date of this Agreement shall become subject to the obligations and

procedures of this Agreement."[33]  In that regard, the agreement requires the Navy to meet

established performance standards in completing *all* remedial activities at NWIRP, including

continued remediation of the chlorinated-solvent plume at issue in this litigation.[34]

Paragraph 3.1 of the Federal Facility Agreement establishes that it is "binding upon EPA

and the Navy."[35]  In addition, the agreement provides that it is enforceable by either party in

---

[33] Ex. B-4, *supra* note 9, at 12, ¶¶ 5.4, 5.5.

[34] *Id.* at 14–16, ¶¶ 6.8, 6.9.

[35] *Id.* at 8, ¶ 3.1.

13

accordance with a detailed dispute resolution process set forth in the agreement itself.[36]

Moreover, the settlement expressly establishes deadlines for the Navy's performance and allows

U.S. EPA to assess stipulated penalties of up to $5,000 for the first week and $10,000 for each

additional week of any noncompliance by the Navy.[37]

The Federal Facility Agreement reserves only certain rights to U.S. EPA in the event, for

example, previously unknown conditions are discovered or additional information later surfaces

regarding the facility.[38]  It would have been unnecessary for U.S. EPA to make any such

reservation if the agreement did not otherwise resolve the Navy's liability.  Although there is no

express commitment by U.S. EPA not to sue the Navy, the agreement's dispute resolution

provision establishes an agreed mechanism for enforcement.[39]

Nor is it important that the Navy did not admit its own liability in the Federal Facility

Agreement.  Settlement agreements rarely contain such an admission.  *United States v. Kramer,*

757 F. Supp. 2d 511, 518 (D.N.J. 2010).  Further, CERCLA itself provides that parties need not

admit liability in administrative settlements.  42 U.S.C. § 9622(d)(1)(B) (2012) ("[T]he

participation by any party in the process under this section shall not be considered an admission

of liability for any purpose . . . .").

In asserting that a consent order issued by U.S. EPA was an administrative settlement, the

United States emphasized in its amicus brief in *Hobart* that the order referred specifically to

CERCLA Section 122, regarding settlements, for its authority—just as the Federal Facility

---

[36] *Id.* at 73–74, ¶¶ 23.1–23.5.

[37] *Id.* at 70, ¶ 21.1.

[38] *E.g., id.* at 75, ¶ 25.1.

[39] *Id.* at 67–70, ¶ 20.1–11.

Agreement does here.[40]  The United States also pointed out that the order's dispute resolution provisions, similar to those in the Navy's NWIRP agreement, were indicative of a settlement.[41] In addition, the government agreed in *Hobart* that the lack of any affirmative admission of liability by the settling party did not change the analysis.[42]

The Federal Facility Agreement between the Navy and U.S. EPA plainly constitutes a resolution of the Navy's NWIRP liabilities under the settlement statute it cites.  The agreement, with built-in dispute resolution procedures, thus confers contribution rights and protections under Section 113 while prohibiting cost-recovery claims under Section 107.  It would be incongruous for the United States to take a contrary position here in an attempt to allow the Navy to evade the three-year statute of limitations and other restrictions on contribution claims.

## III.    THE NAVY'S PURPORTED CLAIM UNDER SECTION 107 IS TIME BARRED

The Navy's stale claim fares no better under the statute of limitations applicable to cost recovery actions under CERCLA Section 107.  Here, the Navy alleges that it discovered chlorinated-solvent contamination in groundwater under the northern portion of NWIRP as far back as 1989.[43]  By the Navy's own timeline, six years elapsed before the Navy began construction of a groundwater extraction and treatment system at NWIRP in 1995 to prevent the chlorinated VOC plume from migrating.[44]

After two years of construction, the Navy's extensive remedial system began pumping

---

[40] *Hobart* Brief, *supra* note 29, at 17.

[41] *Id.* at 16.

[42] *Id.* at 19–21.

[43] Doc. 1, Navy's Compl. ¶ 19.

[44] *Id.* at ¶ 22.

and treating groundwater in 1997, and has been operating continuously ever since.[45]  In the past 20 years of uninterrupted operation, the system—including a network of no fewer than 23 groundwater extraction wells, associated trenches and piping, and an on-site treatment plant—has reportedly treated approximately 97 million gallons of contaminated groundwater.[46]  The Navy cannot justify under *any* provision of CERCLA its belated filing of this suit more than two decades after beginning that large-scale and long-term remediation project.[47]

CERCLA provides that a claim for recovery of remedial-action costs must be brought within six years of the "initiation of physical on-site construction of the remedial action."  42 U.S.C. § 9613(g)(2).  The statute defines "remedial actions" as "those actions consistent with *permanent remedy* taken . . . to prevent or minimize the release of hazardous substances *so that they do not migrate* to cause substantial danger to present or future public health or welfare or the environment."  42 U.S.C. § 9601(24) (emphasis added).  As concrete examples of "remedial action," Congress listed "confinement," "neutralization," "perimeter protection using . . . trenches," "diversion," and "onsite treatment"—the very activities the Navy claims it undertook at NWIRP beginning no later than 1997 with the pump-and-treat system it started constructing two years earlier.[48]

---

[45] *Id.* at ¶ 23.

[46] Ex. B-5, Five-Year Review, NWIRP Bedford, Sept. 2014, at p 2-24, § 2.6.2; Ex. B-6, *supra* note 9, at 26; Ex. B-11, ENSR, *Short Term Measure Design Plan of Action/Work Plan*, May 1992.

[47] It is not necessary for purposes of this motion for the Court to address whether the NWIRP installation should be considered a single, integrated "facility" for which the earliest remedial activity on any portion of the site triggers the statute of limitations.  *See, e.g., Colo. v. Sunoco, Inc.,* 337 F.3d 1233, 1241 (10th Cir. 2003).  Even focusing only on the Navy's pump-and-treat system, the statute of limitations expired long ago.

[48] These terms are *not* included in the statutory definition for "removal," the other type of response action under CERCLA.  *See* 42 U.S.C. § 9601(23); *see also Allende v. Shultz,* 845 F.2d 1111, 1117 (1st Cir. 1988) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The Navy's reference to its pump-and-treat system, which has operated nonstop for the past two decades, as a "Short Term Measure" or an "Interim Remedial Action" does not make it any less "remedial" in nature.[49]  CERCLA requires only that the remedial action be "consistent with permanent remedy" and specifically recognizes "*interim* remedial actions."  42 U.S.C. § 9604(c)(8) (2012) (emphasis added); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 234–35 (2d Cir. 2014).  Moreover, a response that bears the hallmarks of "remedial action" does not change its nature by virtue of the label the plaintiff uses, particularly when, as here, that response was built to last indefinitely and has operated without interruption for more than 20 years.  *United States v. ConocoPhillips Co.*, No. W-11-CV-167, 2012 WL 4645616, at *6 (W.D. Tex. Sept. 30, 2012).

A May 1992 work plan prepared under the Navy's Comprehensive Long-Term Environmental Action Program indicated that the groundwater treatment and containment system at NWIRP would "be designed and implemented to be consistent with the overall site remediation approach."[50]  Moreover, the work plan assumed that the system would operate for at least 30 years.[51]  The Navy's ROD, which was issued in 2010 and is referenced in the Navy's complaint in this action, expressly called for "[c]ontinued operation of the existing groundwater pump-and-treat system . . . for plume capture and control" as the principal component of the final remedy.[52]  There can be no doubt, therefore, that the Navy's extensive pump-and-treat system is

---

[49] Doc. 1, Navy's Compl. ¶ 22; Ex. B-5, *supra* note 46, at p. 2-3, § 2.2 (Table 2-1); Ex. B-7, *Interim Remedial Design Pump and Treat Evaluation NWIRP*, Feb. 27, 1992.

[50] Ex. B-11, *supra* note 46, at p. 1-1, § 1.2; *see also* Ex. B-10, *supra* note 24, at p. 1-4, § 1.4.

[51] Ex. B-11, *supra* note 46, at p. 3-13, § 3.3.3.

[52] Ex. B-6, *supra* note 9, at 1 & 24, § 2.12.2.  The only additional requirements in the ROD were "[i]n-situ enhanced bioremediation" and "natural attenuation" with land use controls to prevent future groundwater use.  *Id.*; *see also* Ex. B-5, *supra* note 46, at p. 2-8, § 2.4.4 ("Since the system was effective in containing the northern plume,

"consistent with [the] permanent remedy" and thus constitutes "remedial action" for which the six-year statute of limitations began running no later than 1995.

The fact that the Navy did not issue its ROD for another 15 years while it "intermittently investigated the plume" does not change the analysis. The definition of "remedial action" focuses on whether an action is consistent with a permanent remedy, not whether a ROD has been issued. *Schaefer v. Town of Victor*, 457 F.3d 188, 207 (2d Cir. 2006) (government would have "almost unlimited discretion as to when, or even whether, the limitations period begins to run" if statute of limitations depended on agency approval of remedial action plan); *United States v. Navistar Int'l Transp. Corp.,* 152 F.3d 702, 712 (7th Cr. 1998) (Congress "surely would have provided us with more explicit direction" if statute of limitations depended on agency action); *see also Am. Premier Underwriters, Inc. v. Gen. Elec. Co.,* 866 F. Supp. 2d 883, 892 (S.D. Ohio 2012) ("actions taken before the RI/FS and the final plan . . . may constitute remedial action").

In a recent case, this Court distinguished between "remedial actions," for which the six-year statute of limitations starts running upon the "initiation of physical on-site construction," and "removal actions," for which the limitations period is three years and runs from "completion of the removal action." *United States v. Boston & Maine Corp.*, No. CV 13-10087-IT, 2016 WL 5339573, at *14 (D. Mass. Sept. 22, 2016) (citing 42 U.S.C. § 9613(g)(2)). The Court specifically noted that the "United States' . . . position—that the nature of the procedure used to select the response action determines whether the action is removal or remedial—is not supported by CERCLA's text." *Id.* at *10 n.3. The Court stated, moreover, that it could not "import a limitation not present in the statute." *Id.* at *14.

---

the system was incorporated into the final remedy.").

As the Court observed in *Boston & Maine*, "[t]he statute of limitations for remedial actions is triggered by 'physical on-site construction,' not by measures such as testing, monitoring, or designing a remedy, or otherwise evaluating the site." *Id.* at *14 (citing *United States v. Findett Corp.,* 220 F.3d 842, 949 (8th Cir. 2000)).  "In contrast," the Court stated, "removal actions include such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." *Id.* (quoting 42 U.S.C. § 9601(23)).

To the extent the Navy's alleged "intermittent investigations" were removal actions, the Navy has acknowledged that those actions were completed by the time the ROD was issued in 2010.  Thus, the three-year limitations period for such actions expired no later than 2013.  *Id.* at *13–14 (Because a removal, by definition, is not complete until the remedial investigation has concluded, "courts look to certain events, such as the completion of a Remedial Investigation/ Feasibility Study, issuance of a [ROD], or some other determination . . . to mark the completion of the entire removal action").

It does not follow, however, that the only "remedial" activity occurred after the ROD incorporated the pre-existing remedy, much less that the construction of that remedy began entirely after the ROD was issued, as the Navy alleges in its complaint in an attempt to plead around the statute of limitations.  As the Court stated in *Boston & Maine,* the "statute defines 'removal' and 'remedial' by the purposes those actions serve, not the procedures used to select them."[53]  *Id.* at *10 n.3.  The Court noted that the salient characteristic of a remedial action is its

---

[53] Further, "whether a cleanup activity is characterized as a removal action or as a remedial action is a question of law" for the Court to determine.  *Boston & Maine,* 2016 WL 5339573, at *10; *see also ConocoPhillips,* 2012 WL 4645616, at *6 (granting motion to dismiss Navy's CERCLA claim as untimely, based on finding that "Interim Stabilization Measures" were "remedial" not "removal" actions the Navy had constructed more than six years before suit was filed).

focus on mitigating "the threat posed by the migration of [contaminants] . . . to some other location where they might cause substantial danger." *Id.* at *12. Inhibiting off-site migration was, of course, the express purpose for the Navy's installation of its pump-and-treat system in 1995 and its continuous operation of that system since start-up in 1997.[54] The large-scale system, which remains in operation today, was by design at its inception a quintessential "remedial action." Because construction of that system began in 1995, the six-year limitations period expired by no later than 2001.

## CONCLUSION

For all of the foregoing reasons, Raytheon respectfully requests that this Court dismiss the Navy's complaint with prejudice for failure to state a claim upon which relief can be granted.

Dated: December 20th, 2017                     Respectfully submitted,

                                               /s/ Stephanie S. McGraw

SHOOK, HARDY & BACON LLP                       SHOOK, HARDY & BACON LLP
James F. Thompson (*Pro hac vice* to be filed)  Stephanie S. McGraw, BBO #675530
2555 Grand Boulevard                           600 Travis St., Suite 3400
Kansas City, MO 64108-2613                     Houston, Texas  77002-2926
Telephone: 816.474.6550                        Telephone: 713.227.8008
Facsimile: 816.421.5547                        Facsimile: 713.227.9508
Jfthompson@shb.com                             smcgraw@shb.com

                                               ATTORNEYS FOR DEFENDANT
                                               RAYTHEON COMPANY

---

[54] Doc. 1, Navy's Compl. ¶ 22 ("In or about 1995, the Navy started building a pump and treat system . . . *to stop the chlorinated solvent plume from migrating*" (emphasis added)); Ex. B-4, *supra* note 9, at 15 ¶ 6.9 (system was installed to contain the plume and "prevent VOC contamination of drinking water supplies and environmentally sensitive areas such as wetlands"); Ex. B-7, *supra* note 49, at § 3.1 (goal of system was "to *halt the migration* of VOCs" (emphasis added)); Ex. B-5, *supra* note 46, at § 2.3 (purpose of system was "[t]o prevent migration of VOCs . . . to Elm Brook and the associated wetlands").

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December, 2017, I electronically filed the above with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

Patrick M. Casey
United States Department of Justice
Patrick Henry Building
601 D Street
Washington, DC 20004
(202) 514-1448
patrick.casey@usdoj.gov

Rachel Evans King
United States Department of Justice
Environmental Enforcement Section
601 D Street, NW
Washington, DC 20004
202-514-5471
rachel.king@usdoj.gov

Bradley L. Levine
United States Department of Justice
P.O. Box 7611
Washington, DC 20044
202-514-1513
bradley.levine@usdoj.gov

**ATTORNEYS FOR PLAINTIFF**

 /s/ Stephanie S. McGraw
**ATTORNEY FOR DEFENDANT**
**RAYTHEON COMPANY**