**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                  Plaintiff,            )
                                        )
      v.                                )        CIVIL ACTION NO.  1:17-cv-11816
                                        )
RAYTHEON COMPANY,                       )
                                        )
                  Defendants.           )
_____)

## UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT RAYTHEON COMPANY'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

The Raytheon Company's ("Raytheon") motion to dismiss for failure to state a claim upon which relief can be granted ("Motion to Dismiss"), fails to meet the legal standard under Fed. R. Civ. P. 12(b)(6). Accepting the well-pleaded factual allegations of the Complaint as true, the Court can reasonably draw an inference of liability from those facts sufficient to show entitlement to relief.

Specifically, the United States filed a Complaint under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C. §§ 9607(a), alleging that Raytheon, at the time of disposal of hazardous waste, operated a facility from which there was a release of hazardous substances which has caused the United States to incur response costs. Based on the alleged facts in the Complaint, the United States seeks recovery of response costs from Raytheon pursuant to 42 U.S.C. § 9607(a), and declaratory judgment pursuant to 42 U.S.C. § 9613(g)(2).

Raytheon's motion to dismiss does not challenge the allegations of the United States' complaint, but instead relies upon over 500 pages of attachments – documents outside the United

1

States' complaint, for its arguments. As set forth more fully below, the standard for considering

documents outside the United States' complaint under the law of this Circuit is a narrow one.

## I. BACKGROUND

Raytheon operated the Naval Weapons Industrial Reserve Plant Bedford ("NWIRP

Bedford") during all years the plant was in use, approximately 1952 to 2000. Complaint, ¶ 12

(Docket No. 1); Ex. B-4, p. 52 of 387, ¶ 6.3 (Docket No. 11-2); Ex. B-6, p. 255 of 387, ¶ 2.1

(Docket No. 11-2). NWIRP Bedford's buildings were constructed for Raytheon's use and have

been vacant since Raytheon departed in 2000. Ex. B-10, p. 336 of 387, ¶ 1.3 (Docket No. 11-2);

Ex. B-4, p. 52 of 387, ¶ 6.3 (Docket No. 11-2); Ex. B-5, p. 149 of 387, ¶ 1.2 (Docket No. 11-2);

Ex. B-6, p. 255 of 387, ¶ 2.1 (Docket No. 11-2). Raytheon designed, fabricated, and tested

prototype weapons equipment including radar and missile guidance systems at NWIRP Bedford.

Complaint, ¶ 13 (Docket No. 1), Ex. B-4, p. 52 of 387, ¶ 6.4 (Docket No. 11-2). Raytheon's

operations generated chlorinated solvent wastes including trichloroethylene, trichloroethane, and

tetrachloroethene. Complaint, ¶¶ 15-18 (Docket No. 1); Ex. B-4, p. 52 of 387, ¶ 6.4 (Docket No.

11-2); Ex. B-5, p. 163-4 of 387, ¶ 2.3.1 (Docket No. 11-2). These and other chlorinated solvents

are now found in the groundwater beneath NWIRP Bedford in a plume that extends northwest

from the former Components Laboratory, which Raytheon used to fabricate and test prototypes.

Complaint, ¶ 14 (Docket No. 1); Ex. B-5, pp. 150 of 387, 163-4 of 387, ¶ 2.3.1 (Docket No. 11-

2); Ex. B-6, p. 255 of 357, ¶ 2.1 (Docket No. 11-2); Ex. B-10, p. 333 of 387, ¶ 1.2 (Docket No.

11-2). This plume is referred to as the "Site" in the Complaint and as "Site 3" in the Navy's

documentation. Complaint, ¶ 14 (Docket No. 1); Ex. B-5, p.147 of 387, ¶ 1.0 (Docket No. 11-2);

Ex. B-6, p. 252 of 387, ¶¶ 1.1 and 1.2 (Docket No. 11-2).

## II.  LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMSS

This Court recently noted the applicable standard of review for Motions to Dismiss:

> To overcome a Fed. R. Civ. P 12(b)(6) motion to dismiss for failure to state a claim, a complaint must allege sufficient facts 'to state a claim to relief that is plausible on its face.' . . . [T]he court must accept the remaining factual allegations as true and decide if, drawing all reasonable inferences in the plaintiffs' favor, they are sufficient to show an entitlement to relief. . . . A motion to dismiss must focus not on whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support the claims . . .

*De Prins v. Michaeles*, 236 F. Supp. 3d 482, 487 (D. Mass. 2017). The legal standard for considering documents outside the United States' complaint under the law of this Circuit is a narrow one, reserved "for documents the authenticity of which are not disputed by the parties." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993). Moreover, the facts that establish the defense must be definitively ascertainable from the documents and the facts gleaned must conclusively establish the affirmative defense. *See Blackstone Realty L.L.C. v. F.D.I.C.*, 244 F.3d 193,197 (1st Cir. 2001); *LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 509 (1st Cir. 1998). As set forth below, Raytheon's motion to dismiss must fail under the standards for considering motions to dismiss.

## III.  ARGUMENT

### A.  <u>Raytheon Cannot Establish the Criteria for Res Judicata Preclusion of this Action</u>

Raytheon argues that the Navy's claim is barred by res judicata, relying on a package of six agreements resolving an earlier action. *See Motion to Dismiss*, ¶ (1) (Docket 10), and Raytheon's Memorandum, pp. 5-9 (Docket 11). "[T]he elements of a res judicata defense are (1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two actions." *In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12, 16 (1st Cir.

2003) (citations omitted); *see also Steele v. Ricigliano,* 789 F. Supp. 2d 245, 248 (D. Mass. 2011).

Raytheon does not meet its burden of showing a final judgment on the merits in the earlier proceeding or sufficiently identical causes of action in the earlier and the instant case.

1.  **There Was No Final Judgment on the Merits in the Prior Lawsuit Precluding This Action**

In 1989, the Town of Bedford ("Bedford") filed a civil action under CERCLA against, among others, Raytheon and the United States Navy ("Navy") for contamination of Bedford's drinking water wells. Ex. A-1, pp. 11 and 23 of 125, ¶ 23, 80, and 81 (Docket No. 11-1). In response to the allegations in Bedford's Complaint, both Raytheon and the Navy filed cross-claims against each other, alleging contribution and indemnification claims if they were adjudged liable to Bedford (or others). *See* Ex. A-7, pp. 103-112 of 125, ¶¶ 1-5, 10-14, 15, 17, 18, 20-21, 23-24, 28-29, 30, 32-34, and 36-37 (Docket No. 11-1); A-2, pp. 40-49 of 125, ¶¶ 1-6, 30-39 (Docket No. 11-1). Each of Raytheon's and the Navy's cross-claims were contingent on their respective liability to Bedford (or others). *Id.*

Ultimately, the Bedford civil action was resolved by a compromise and a package of six cross-referencing settlement documents ("1993 Global Settlement"). *See* Ex. B-1, Ex B-2, Ex. B-3, Ex. A-3, and Ex. A-4 (Docket No. 11-2 and 11-1); *see also Bedford v. Raytheon*, No. 89-cv-2313 (D. Mass. 1989) (Docket Nos. 286-289).

As set forth in the 1993 Global Settlement, all of the claims and contingent cross-claims, (and third-party claims) were dismissed with prejudice, except that this Court retained jurisdiction for implementing the agreements entitled "Agreement Between Town of Bedford and Department of the Navy *Regarding Site Y*" (emphasis added) and "Settlement Agreement Between the Department of the Navy and the Department of the Air Force and Raytheon," dated

4

January 29, 1993. *See* Ex. A-4, p. 1-2, Ex. B-2, and Ex. B-3 (Docket 11-1 and 11-2); *Bedford*

No. 89-cv-2313 at Docket No. 289.

The 1993 Global Settlement consisted of the following documents, all but one of which

are attached to Raytheon's Memorandum (Docket No. 11):

1. March 31, 1993, Consent Judgment, Ex. A-4 (Docket No. 11-1).
2. January 29, 1993 Settlement Agreement and Releases, Ex. B-1 (Docket No. 11-2).
3. January 29, 1993 Agreement between Town of Bedford and Department of the Navy Regarding Site Y, Ex. B-2 (Docket No. 11-2).
4. January 29, 1993 Settlement Agreement Between the Department of the Navy and the Department of the Air Force and Raytheon Company, Ex. B-3 (Docket No. 11-2)
5. March 31, 1993 Stipulation of Dismissal, Ex. A-3 (Docket No. 11-1).
6. March 31, 1993 Stipulation of Dismissal[1]

Any adjudication in the Bedford case did not include the United States' CERCLA § 107

claims as the United States' authority for those claims was expressly reserved in the 1993 Global

Settlement. *See* Ex. B-2, ¶ 5 and Ex. B-3, ¶ 9 (Docket No. 11-2). The claims that were

adjudicated in that case were the direct claims of Bedford for its costs and the derivative

contingent cross-claims of the Navy and Raytheon. The 1993 Global Settlement provides that

Raytheon and the Navy, "hereby release and forever discharge Bedford and each and every other

party delineated within paragraph 1.1 herein . . . of and from all demands, actions, causes of

action, suits, damages, costs, expenses, liabilities or any other claims whatsoever at law or in

equity which they *now have or had prior to the* [January 29, 1993] *effective date of the*

*agreement*." *See* Ex. B-1, ¶¶ 1.1 and 1.2 (emphasis added) (Docket No. 11-2). The adjudication

in the Bedford case did not include the reserved United States' CERCLA 107 claims. Nor did the

---

[1] A sixth settlement document, Raytheon's Stipulation of Dismissal, was not included in the Raytheon Memorandum exhibits. *See Bedford v. Raytheon*, No. 89-cv-231 (D. Mass. 1989) (Docket No. 288).

Bedford case adjudicate or resolve the post 1993 alleged claims in the instant case. *See*

Complaint, ¶¶ 12, 29, and 32 (Docket No. 1).[2]

Contrary to Raytheon's arguments, and as provided in the 1993 Global Settlement, the

Navy expressly reserved the Navy's authority under CERCLA § 104, 42 U.S.C. § 9604; i.e., to

act, to remove or arrange for the removal of, and provide for remedial action, or take any other

response measure deemed necessary to protect the public health or welfare or the environment.[3]

*See* Raytheon Memorandum, pp. 5-6 (Docket No. 11); Ex. B-2, ¶ 5, and Ex. B-3, ¶ 9 (Docket

No. 11-2). The 1993 Global Settlement specifically provides that:

> [t]his release does not abridge . . . the Navy's rights under separate agreements
> executed this same day entitled "Agreement Between Town of Bedford and
> Department of the Navy *Regarding Site Y*" (emphasis added) and 'Settlement
> Agreement Between the Department of the Navy and the Department of the Air
> Force and Raytheon"; nor does the release in this paragraph 1.2 apply as between
> Raytheon, the Air force and the Navy, they having addressed these issues in the
> aforesaid separate agreement.

Ex. B-1, p. 12 of 387, ¶ 1.2 (Docket No. 11-2). Those Navy rights included the explicit

reservation of the Navy's authority under CERCLA § 104. *See* Ex. B-2, p. 24 of 387, ¶ 5 and Ex.

B-3, p. 33-34 of 387, ¶ 9 (Docket 11-2). The CERCLA § 104 authority includes enforcement

actions under CERCLA § 107 and § 113(g), 42 U.S.C. §§ 9607 and 9613. *See infra* n.5 and n.10.

As a result, Raytheon fails to meet its burden to bring forward documents from which it is

definitively ascertainable that there was an adjudication on the merits in the prior lawsuit

regarding the Navy's post 1993 claims and the Navy's CERCLA § 107 claims as alleged in the

United States' Complaint (Docket No. 1).[4]

---

[2] On January 29, 1993, the effective date of the agreement, the United States did not have any post-January 29, 1993 claims against Raytheon. *See* Ex. B-1, p. 12 of 387, ¶ 1.3 (Docket No. 11-2).
[3] *See* 42 U.S.C. § 9604(a). Congress authorized the President to act under CERCLA § 104. On January 23, 1987, the President delegated CERCLA § 104 authority to the Secretary of Defense. *See* Executive Order 12580, 52 Fed. Reg. 2923, 3 C.F.R. 193 (1987 Comp).
[4] More specifically, Raytheon has not established what areas of contamination and related remedial costs are covered by the agreements in the 1993 Global Settlement Package regarding Site Y. *See* Ex. B-2 and B-3. Raytheon

### 2.   There were Not Identical Causes of Action Between these Two Cases

For the same reasons discussed in Argument Section III.A.1. above, because of the limited claims (Bedford claims on or prior to March 31, 1993, and the related contingent Navy claims for contribution) resolved in the Bedford case, and the Navy's express reservations identified in the 1993 Global Settlement, Raytheon also fails to meet its burden of conclusively establishing identical causes of action. *See* Complaint, ¶ 12 ("Raytheon operated the 46-acre Plant in Bedford, MA . . . *to approximately 2000*.") (emphasis added). The claims in the 1989 Bedford lawsuit were, in relevant part, Bedford's claims against the Navy and Raytheon, and Navy's and Raytheon's cross-claims contingent on their potential liability to Bedford. *See* Ex. A-1, A-2, and A-7 (Docket 11-1).

The Complaint in the instant case includes the Navy's claims for all investigations and costs through the date of the Complaint for the plume of contaminated solvents released into the groundwater at NWIRP Bedford from Raytheon's operations. *See* Complaint ¶¶ 1, 12, 29, 30, and 32. (Docket No. 1). The allegations in the instant action exceed the timeframes, contamination areas, and costs in the 1989 Bedford action and the 1993 Global Settlement. The claims brought in the instant case include those reserved in the 1993 Global Settlement, and ones that are distinct from those brought in the 1989 Bedford lawsuit, and will require analysis of issues not addressed in the Bedford case. Furthermore, those distinct claims are based on facts which were either unknown in 1993 or had not yet occurred by then and, therefore, could not have been litigated in the Bedford case. Thus, the claims in the instant Complaint do not arise from the common nucleus of operative facts as in the Town of Bedford's complaint for its own contaminated wells.

---

has not established that costs for Site Y are included in the Navy's claims in the instant case.  Raytheon has not identified the areas of contamination that were unknown in 1993.

Raytheon has cited to no support for summarily claiming that "the remediation of chlorinated-solvent contamination from the NWIRP facility" was "central to" the Town of Bedford's claims and to the Bedford litigation. The Town of Bedford's action was explicitly to address the contamination of its wells from any and all "hazardous substances" detected in the wells – no matter the source. The Town even included a property other than NWIRP Bedford as potentially responsible for the wellfield contamination, operated by a third defendant Massport with the Airforce. Ex. A-1, p. 20 of 125, ¶¶ 72-74 (Docket No. 11-1).

Nor do any documents in the over 500 pages attached to the Raytheon Memorandum provide facts definitively ascertainable that conclusively establish that these actions are identical causes of action. As a result, Raytheon fails to meet its burden of showing identical causes of action and fails to establish that second prong of an affirmative defense of res judicata.

### 3.  The CERCLA § 107 Claim Was Not Resolved in the Town of Bedford Action

Raytheon further argues that, under Fed. R. Civ. P. 13(a), in response to Raytheon's cross-claims, the Navy was obligated to seek recovery as a compulsory counter-claim in the prior Bedford case for the investigative costs the Navy was incurring at that time. *See* Raytheon Memorandum, p. 9 (Docket No. 11). Even if this Court were to determine that the pre-Bedford case CERCLA § 107 counter-claims could have been brought in the Bedford case, those claims were expressly reserved in the 1993 Global Settlement. *See* Ex. B-2, p. 24 of 387, ¶ 5, and B-3, p. 33 of 387, ¶ 9 ("Nothing in this agreement shall be construed or applied to limit the Navy's authority to proceed with response action pursuant to section 104 of CERCLA, 42 U.S.C. § 9604.") (Docket 11-2).[5] Moreover, the post-1993 Global Settlement claims and the alleged facts

---

[5] "Response," which is authorized under CERCLA § 104, is defined in CERCLA and "include[s] enforcement activities . . ." 42 U.S.C. 9601(25).

that form the basis of those claims could not have been brought in the earlier lawsuit as they had

not yet occurred. *See* Complaint, ¶¶ 12, and 29-30, 32 (Docket No. 1).

**B.  The Naval Weapons Industrial Reserve Plant (NWIRP) Interagency Agreement Does Not Prevent The Navy From Recovering Its Costs In This Action.**

Raytheon also argues that the Complaint should be dismissed as a result of an interagency

agreement, called a "federal facility agreement" between the Navy and EPA. *See* Raytheon's

Memorandum, pp. 9-15 (Docket No. 11); Ex. B-4 (Docket No. 11-2). Disregarding the

applicable CERCLA provisions regarding federal facilities and the NWIRP Federal Facility

Agreement's (hereafter, "FFA") purpose and operative language, Raytheon asserts that the

interagency agreement between the Navy and EPA is a *settlement* that "plainly constitutes a

resolution of the Navy's NWIRP liabilities" under CERCLA. *See* Raytheon's Memorandum, pp.

10 and 15 (Docket No. 11). Based on this mistaken understanding of the FFA, Raytheon argues

that the FFA provides the Navy with a right of contribution under Section 113(f)(3)(B) of

CERCLA, and that this is the Navy's exclusive cause of action. *See id.* p. 10 n.28 (citing cases

holding that a private PRP that has resolved liability within the meaning of Section 113(f)(3)(B)

has a contribution action and must use it and may not instead use Section 107). To the contrary,

the Navy's CERCLA claim against Raytheon is properly asserted under Section 107(a)(4)(A),

and Section 113(f)(3)(B) has no applicability here because the FFA did not resolve any Navy

liability within the meaning of the statute. Raytheon cites cases involving actual settlements,

including administrative settlements, between the United States and private parties that resolved

a private party's liability at privately-owned sites where no federal facility was involved. But

Raytheon cites not a single case that involved a comparable Federal Facility Agreement between

two federal agencies to support its erroneous application of Section 113(f)(3)(B), and indeed no

court has held that any similar federal facility agreement bars the United States or any federal

agency from seeking cost recovery under Section 107(a)(4)(A) from a liable party, such as Raytheon.

Under CERCLA Section 113(f)(3)(B), a person has a right of contribution if it has "*resolved its liability* to the United States . . . for some or all of a response action for some or all of the costs of such action in an administrative or judicially approved settlement . . . ." 42 U.S.C. § 9613(f)(3)(B) (emphasis added). However, the fallacy in Raytheon's argument that Section 113(f)(3)(B) applies here to bar the Navy's Section 107(a)(4)(A) claim is that the FFA is not a settlement of the Navy's liability. *See United States v. Atlantic Research Corp.*, 551 U.S. 128, 132 n.1 (2007) ("Section 113(f)(3)(B) permits private parties to seek contribution after they have *settled their liability* with the Government.") (emphasis added). Unlike a privately-owned site, the process for addressing federal facilities is governed by particular CERCLA provisions that are unique to the federal government, CERCLA § 120, 42 U.S.C. § 9620. Pursuant to CERCLA § 120(e), the Navy was required to enter into a federal *interagency agreement* for the NWIPR Site.[6] This FFA is an agreement that memorializes the manner in which the Navy would perform a remedial investigation and feasibility study and any further remedial design and remedial action at the Site, not a settlement that "resolved" Navy liability "to the United States" within the meaning of CERCLA § 113(f)(3)(B).

---

[6] CERCLA § 120(e) requires, *inter alia*, the following:
> (1) . . . after the inclusion of any facility on the National Priorities List, the department . . . which owns . . . such facility shall, in consultation with the Administrator and appropriate State authorities, commence a remedial investigation and feasibility study for such facility . . .
> (2) The [EPA] Administrator shall review the results of each investigation . . . . [T]hereafter, the head of the department . . . shall enter into an *interagency agreement* with the Administrator for the expeditious completion by such department . . . of all necessary remedial action at such facility. . . .
> (3) Remedial actions at facilities subject to *interagency agreements* under this section shall be completed as expeditiously as practicable. . . .

Section 120(e), 42 U.S.C. § 9620(e) (emphasis added).

Section 120(e)(6) of CERCLA clearly distinguishes between the FFA and a different situation not at issue here, where the United States enters a settlement agreement under Section 122 of CERCLA with a non-federal entity to perform a response action at a federally-owned or operated facility.[7] Thus, if the work is to be done by a PRP *other than* the United States entity that owns or operates the facility, EPA may choose to enter into a *settlement*, not a federal facility agreement. But that is not the situation here. Unlike a settlement agreement that identifies and settles specific liabilities, the interagency agreement required under Section 120(e)(2) is the product of a statutory scheme that delegates Presidential CERCLA authorities to both EPA and federal agencies for federal sites on the National Priorities List. Further, Section 120(a)(1) states, "Nothing in this section shall be construed to affect the liability of any person or entity under sections 9606 and 9607 of this title," 42 U.S.C. § 9620(a)(1). Thus, in accordance with the statute, this FFA has no bearing on either the Navy's or Raytheon's CERCLA liability. The fact that the Navy entered into and performed work pursuant to the FFA does not mean that the Navy has resolved any liability under the agreement. Nor does it mean that Raytheon is not liable for it under CERCLA.[8]

---

[7] "If the Administrator, in consultation with the head of the relevant department . . . of the United States, determines that remedial investigations and feasibility studies or remedial action will be done properly at the Federal facility by *another potentially responsible party* . . . the Administrator may enter into an agreement with such party under section 9622 of this title (relating to *settlements*). Following approval by the Attorney General of any such agreement relating to a remedial action, the agreement shall be entered in the appropriate United States district court as a consent decree under section 9606 of this title." 42 U.S.C. § 9620(e)(6) (emphasis added).

[8] Two cases have recently provided guidance for interpreting whether the language of an agreement has resolved liability as provided in Section 113(f)(3)(B). In *Hobart Corp. v. Waste Management of Ohio, Inc.,* 758 F.3d 757 (6th Cir. 2014), contrary to the generalizations advanced by Raytheon, the Sixth Circuit emphasized that a court "must look to the specific terms of an agreement to determine whether it resolves a PRP's liability." 758 F.3d at 770. Examining the language of the agreement at issue, the court found that a specific statement that the agreement was intended to resolve liability within the meaning of Section 113(f)(3)(B), an unambiguous covenant not to sue, and other provisions made it clear that the settlement resolved liability within the meaning of Section 113(f)(3)(B). *Id.* at 768-69. In *Asarco LLC v. Atlantic Richfield Co.*, 866 F.3d 1108 (9th Cir. 2017), the court looked to dictionary meanings of "resolve" and reasoned that implicit in them is "an element of finality. If the parties reach a 'firm decision about' liability, then the question of liability is not susceptible to further dispute or negotiation." *Id.* at 1122. A resolution of liability does not occur within the meaning of Section 113(f)(3)(B) merely because a party agrees to perform a response action. *Id* at 1125-26. Rather, as the Ninth Circuit confirmed, the question turns on a

Turning to the FFA, a review of its language clearly supports the conclusion that the agreement does not resolve liability. There is *no* covenant not to sue and no resolution of liability language, *see* Ex. B-4, pp. 113-114 of 387, and EPA's reservation of rights are broad. *Id.* at p. 114 of 387. Further, the FFA specifically states that it is intended to meet the purposes of CERCLA § 120(e) and broadly reserves the Navy's rights. For example, the FFA provides that the Navy entered into the agreement under CERCLA § 120(e). *See* Ex. B-4 p. 41 of 387, ¶¶ 1.1.C and D (Docket No. 11).[9] The agreement specifically identifies one of the general purposes of the agreement as being to "[m]eet the requirements of CERCLA Section 120(e)(2), 42 U.S.C. § 9620(e)(2), for an *interagency agreement* between the parties." *See* Ex. B-4 p. 49 of 387, ¶ 4.2 E. (Docket No. 11). The agreement specifically provides twice that "[n]othing in this Agreement shall alter the Navy's authority with respect to the Removal Actions conducted pursuant to CERCLA Section 104, 42 U.S.C. Section 9604." *See* Ex. B-4, p. 59 of 387, ¶ 8.4; p. 103 of 387, ¶ 18.2 (Docket No. 11). In addition, the agreement expressly provides that the "Navy does not waive any rights it may have under CERCLA Section 120, 42 U.S.C. Section 9620, SARA Section 211 [the Defense Environmental Restoration Program statute], and Executive Order 12580."[10] *See* Ex. B-4, p. 113 of 387, ¶ 23.3 (Docket No. 11-2). Finally, there is no cost recovery

---

careful examination of the language used in the agreement. In *Asarco*, the court found no Section 113(f)(3)(B) "resolution" of liability in a consent decree entered by the United States and the private party performing the corrective actions because the party's liability for the response actions simply was not addressed at all. *Id.* at 1126.

[9] Raytheon argues that the fact that EPA included a reference to Section 122, entitled "Settlements," 42 U.S.C. § 9622, as one of the grounds for its authority for the FFA is evidence that the FFA was intended to resolve liability. *See* Raytheon's Memorandum, p. 12 (Docket No. 11); Ex. B-4, p. 40 of 387 and ¶¶ 1.1 A and B (Docket No. 11-2). However, the fact that § 122 is referenced in the document does not mean in fact that the Navy resolved any liability in the interagency agreement. CERCLA 122(c) provides, "[w]henever the [EPA Administrator] has entered into an agreement under this section, the liability to the United States under this chapter of each party to the agreement, including any future liability to the United States, arising from the release or threatened release that is the subject of the agreement *shall be limited as provided in the agreement pursuant to a covenant not to sue* in accordance with subsection (f) of this section." 42 U.S.C. § 9622(c) (emphasis added). No covenant not to sue is provided in the FFA.

[10] Executive Order 12,580 delegates the CERCLA § 104 authority to the Secretary of Defense. CERCLA § 104 authorizes the Secretary of Defense to "take any . . . response measure . . . [she] deems necessary to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a). "Response" is defined in CERCLA and "means

by EPA in the FFA and no resolution of EPA cost claims. In short, there are no resolutions of the Navy's liability to the United States in the FFA, and the FFA simply follows the process CERCLA establishes for federal agencies to address federally-owned/operated facilities. Nor does the FFA limit the Navy's authority or right to bring a CERCLA § 107 claim as authorized by CERCLA § 104 and as specifically reserved in the FFA.[11]

Raytheon thus fails to meet its burden of conclusively establishing an affirmative defense relating to the NWRIP interagency agreement between the Navy and EPA. Raytheon's Motion to Dismiss for failure to state a claim based on the arguments that the interagency agreement bars the Navy's CERCLA § 107(a)(4)(A) claims should be denied.

For the same reasons, Raytheon's argument that the Navy's claims are barred by the statute of limitations for contribution claims under Section 113(g)(3) is inapposite. The Navy is pursuing its claims under Section 107(a) of CERCLA.

## C.   The United States CERCLA Claims are Not Time-Barred by a Statute of Limitation

The United States timely filed its claim in this matter. The relevant statute of limitations for the United States to seek response costs for a remedial action under CERCLA is six years.[12] The statute of limitations period began at the earliest with the September 22, 2010, record of decision ("ROD"), selecting the remedial action. *See* Complaint, ¶ 26 (Docket No. 1); Ex. B-6, p. 254 of 387 (Docket No. 11-2). Prior to the filing of the complaint, the United States *and*

---

remove, removal, remedy, and remedial action, all such terms (including the terms "removal" and remedial action") include enforcement activities related thereto." 42 U.S.C. § 9601(25).

[11] *See* Ex. B-4 p. 103 of 387*, ¶* 18.2 ("Nothing in this Agreement shall alter the Navy's, the State's, or EPA's authority with respect to Removal Actions conducted pursuant to CERCLA Section 104, 42 U.S.C. Section 9604, and Executive Order 12580."). The agreement also makes clear that the Navy and EPA retain any rights they have against any other persons. *See id.* p. 113 of 387, ¶ 24.2 ("Nothing in this Agreement shall constitute or be construed as a bar, or a discharge, or a release, from any claim, cause of action or demand in law or equity by or against any person, firm, partnership, or corporation not a signatory to this Agreement for any liability it may have arising out of, or relating in any way to the generation, storage, treatment, handling, transportation, [r]elease, or disposal of any Hazardous Substances, hazardous waste, pollutants, or contaminants found at, taken to, or taken from the Site.")

[12] *See* CERCLA § 113(g)(2)(B), 42 U.S.C. § 9613(g)(2)(B).

Defendant agreed to toll the United States' claim for a one year period.[13] Thus, when the United

States filed this action on September 21, 2017, the claim was timely; i.e., within the six year

statute of limitations plus one year of tolling.

      1.   **The Navy Incurred Response Costs for Both Removal and Remedial Actions**

CERCLA empowers the President to respond to releases or threatened releases of

hazardous substances. 42 U.S.C. § 9604(a)(1). A "response" is defined to mean "remove,

removal, remedy, and remedial action . . . ." CERCLA § 101(25), 42 U.S.C. § 9601(25).

Response actions must, to the extent practicable, be consistent with the National Contingency

Plan ("NCP"), 40 C.F.R. Part 300. The NCP was promulgated by EPA pursuant to Congress'

direction in Section 105(a) of CERCLA, 42 U.S.C. § 9605(a). The NCP provides the

organizational structure and procedures for responding to hazardous waste threats. *See State of*

*Ohio v. EPA*, 997 F.2d 1520, 1525 (D.C. Cir. 1993). Compliance with the NCP is central to

CERCLA's liability scheme. Specifically, Section 107(a)(4) of CERCLA, 42 U.S.C. 9607(a)(4),

provides, among other things, that operators are liable for "all costs of removal or remedial

action incurred by the United States Government … not inconsistent with the national

contingency plan."[14]

CERCLA authorizes two types of response actions: removal and remedial. "Removal

actions" may involve investigation and evaluation of the site, cleanup or removal of hazardous

---

[13] *See* Raytheon's Memorandum, p. 3 n. 12 (Docket No. 11).

[14] The NCP sets out rules governing the implementation of removal and remedial actions. 40 CFR §§ 300.415-300.435. In the event of a release or threat of release of a hazardous substance warranting a removal action, it shall begin "as soon as possible." 40 C.F.R. § 300.415. In the event of a remedial action, lead agencies – here the Navy – must follow certain procedures in order to appropriately select a remedial action including: (a) a remedial investigation to collect data to characterize the site, (b) a feasibility study to ensure that appropriate remedial alternatives are developed and evaluated; (c) selection of a proposed remedy from among the remedial alternatives evaluated and explanation of the reasons therefor; (d) allowing for, considering, and responding to public comments on the proposed remedy, and making any necessary changes arising from those comments; and (e) ultimately selecting a final remedy and documenting the reasons therefor in a record of decision. 40 C.F.R. § 300.430.

material, as well as such actions as may be necessary to *prevent, minimize, or mitigate damage to public health* or welfare or the environment.[15] Any removal action should, to the extent practicable, contribute to the efficient performance of any long term remedial action. 42 U.S.C. § 9604(a)(2). "Remedial actions" typically involve steps to ensure a permanent cleanup of the site and to eliminate the threat posed by the site.[16] The statutory definitions and case law make clear there is substantial overlap between the two categories of response actions. *See e.g.*, *Public Service Company of Colorado v. Gates Rubber Company*, 175 F.3d 1177, 1182 (10th Cir. 1999).

CERCLA's limitation periods are to be broadly construed. *Reardon v. United States,* 947 F.2d 1509, 1519 (1st Cir. 1991); *Kelley v. E.I. DuPont de Nemours & Co.,* 17 F.3d 836, 843 (6th Cir. 1994) *citing Reardon*. Raytheon bears the burden to conclusively establish that the Navy's claim is barred by a statute of limitation. *See Fay v. Aetna Life Ins. & Annuity Co.,* 307 F. Supp. 2d 284, 290 (D. Mass. 2004).

Here, the Parties agree the statute of limitations for a remedial action under CERCLA § 107 is six years.[17] The relevant provision for the statute of limitations provides:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced…for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2).

Raytheon does not challenge the allegations of the Complaint as to the Navy's incurrence of response costs, and the Court must accept the allegations as true under the First Circuit law in

---

[15] *See* CERCLA § 101(23), 42 U.S.C. § 9601(23).
[16] *See* CERCLA § 101(24), 42 U.S.C. § 9601(24).
[17] *See* Raytheon Memorandum, p. 16 (Docket No. 11).

considering motions to dismiss.[18] Raytheon attempts to characterize the Navy's response activities as solely remedial; however, the Navy's response actions at the site, and the costs incurred, were both removal and remedial. *See* Complaint, ¶¶ 19-20, 24, 26, and 30 (Docket No. 1).

Responding to releases of hazardous substances, the Navy constructed the groundwater pump and treat system at the Site between 1995 and 1997. Complaint, ¶¶ 22-23 (Docket No. 1). That system was initially called a Short Term Measure ("STM")[19], and later an Immediate Response Action ("IRA"), both defined terms from the Massachusetts Contingency Plan, the state equivalent to the NCP. The pump and treat system from its inception was a removal action. An STM is a construct of Massachusetts regulations and, by definition, is akin to a CERCLA removal action. The objective of an STM – to abate, prevent, or eliminate imminent hazards due to a release or threat of release of hazardous substances, (310 CMR 40.542(1), effective 10/3/88) and an IRA — to contain, isolate, remove, or secure a release or threat of release of hazardous substances, (310 CMR 40.0411(1) effective 7/30/93) – comport closely with those of CERCLA

---

[18] The Navy identified chlorinated solvents in the groundwater (plume) at the NWIRP as early as 1989, and investigated this plume from approximately 1989 until 2010. Complaint, ¶¶ 19-20 (Docket No. 1). During that 20 year period, the Navy conducted multiple remedial investigations, a feasibility study, and solicited and considered public comments. Ex. B-6 pp. 257-258 of 387 (Docket No. 11-2). In 2010, the Navy signed a record of decision selecting a remedial action among five alternatives studied to address the solvent plume from the Site. Complaint, ¶ 24 (Docket No. 1). After the ROD was issued, the Navy designed and implemented the remedial action at the Site, and continues to implement that remedial action. Complaint ¶ 26 (Docket No. 1). The Navy has incurred response costs at the Site that are not inconsistent with the NCP. Complaint, ¶ 30 (Docket No. 1). The selected remedy (Alternative 4) incorporates the groundwater pump and treat system that was built in or about 1995 as a Short Term Measure ("STM"), and that began operating in or about 1997. Complaint, ¶¶ 22, 23, and 25 (Docket No. 1). The remedy in the 2010 ROD selected: enhanced bioremediation of the source area, continued operation of the groundwater pump and treat system, monitored natural attenuation, land use controls, and five-year reviews. Complaint, ¶ 25 (Docket No. 1); Ex. B-6, p. 270 of 387 (Docket No. 11-2).

[19] Short Term Measures shall be taken to abate, prevent, or eliminate imminent hazards due to a release or threat of release of oil or hazardous material…." 310 CMR 40.542(1)(a) effective 10/3/88. "Short Term Measures shall contain, isolate remove, or secure a release of oil or hazardous material and thereby abate, prevent, or eliminate an imminent hazard until such time as conditions at the … disposal site can be addressed through further remedial response actions." 310 CMR 40.542(1)(c) effective 10/3/88. "The need for performing Short Term Measures shall be continually evaluated throughout the remedial response action and undertaken immediately whenever an imminent hazard is discovered." 310 CMR 40.542(1)(d) effective 10/3/88.

removal actions as those "necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." *See* CERCLA § 101(23), 42 U.S.C. § 9601(23).

The investigation into the contamination and the pump and treat system were necessary to prevent and mitigate an immediate release and threat of release of hazardous substances. These were quintessential removal activities recognized by the Courts.[20] The pump and treat system was also an effective removal activity, as Defendant notes.[21] The Navy ultimately incorporated the pump and treat system as one component of the five component remedy it selected after years of remedial investigations, a feasibility study, and public comment process. Ex. B-6, pp. 256-257, 274-281 (Docket No. 11-2). The pump and treat system was also designed and implemented to be consistent with an overall – future – site remediation approach, consistent with CERCLA requirements. Ex. B-11, p. 345 of 387, ¶ 1.2 (Docket 11-2); 42 U.S.C. § 9604(a)(2) (any removal action should, to the extent practicable, contribute to the efficient performance of any long term remedial action).

Removal costs also include those costs necessary to monitor, assess, and evaluate a release or threat of release. CERCLA § 101(24), 42 U.S.C. § 9601(24); *Kelley* 17 F.3d at 843 (". . . Congress intended that the term 'removal action' be given a broad interpretation. . . . [T]he statutory definition of 'removal' is broad, and encompasses both physical removal and all RI/FS 'monitor[ing], assess[ing], and evaluat[ing]' activities"). The Navy incurred these types of costs

---

[20] *See Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 926 (5th Cir. 2000) (removal actions are immediate or interim responses including groundwater quality assessments, a groundwater monitoring and remediation program, and a feasibility study of remedial alternatives); *New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 124-125 (2d Cir. 2013) (removal actions are clean-up or removal measures taken to respond to immediate threats to public health and safety); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 10-cv-044, 2013 WL 1182985, at *7 (N.D. Ind. Mar. 21, 2013) (EPA regulations strongly suggest classifying actions taken as a sort of "first response," in order to mitigate present or threatened release of pollutants into ground and surface water as removal actions.)

[21] The pump and treat system treated over 90 million gallons of water between 1997 and 2014.  Raytheon's Memorandum, p. 16 (Docket No. 11); Ex. B-5, p. 182 of 387 ¶ 2.6.2 (Docket No. 11-2).

during the investigation period from 1989 to 2010, including, for example, the initial assessment study, the remedial investigations, the pilot study, and feasibility study. *See* Ex B-5, 163 of 387, ¶ 2.3; Ex B-6, 256-257 of 387 (Docket 11-2).

Thus, the United States incurred response costs for both removal and remedial activities at the Site.[22]

### 2. Under the statute of limitations in Section 113(g)(2)(B) of CERCLA, the United States is entitled to seek both its removal and remedial costs.

The remedial costs sought in the complaint are subject to the 6-year statute of limitations for remedial actions. The removal costs sought in the complaint are timely sought because the remedial action began within 3 years of completion of the removal action. *See* 42 U.S.C. 9613(g)(2)(B). Here the completion of the removal action and beginning of the remedial action were simultaneous, when the ROD was issued. *See Next Millenium*, 732 F.3d at 129 (holding that the groundwater treatment systems built in response to an immediate health threat and designed to render drinking water safe, without addressing the underlying source of pollution, were "removal" and not "remedial" actions "at least up until the time that the State adopted a remediation plan that incorporated them."); *see also United States v. Davis*; 882 F. Supp. 1217, 1226 (D.R.I. 1995) ("the removal process does not end until the completion of the RI/FS and the issuance of the ROD.").

Raytheon selectively interprets the facts of this case to argue that the groundwater pump and treat system constructed in the mid-90s was – from its inception – a remedial action.

---

[22] Contrary to Raytheon's Memorandum, p. 16, n.47 (Docket No. 11), even if the NWIRP installation were considered a single "facility," the United States' claim is timely. The claim relates only to one operable unit of the NWIRP, Sub-Site 3. This is consistent with the holding in *United States v. Manzo*, 182 F. Supp. 2d 385, 399-404 (D.N.J. 2000) (holding that the statute of limitations runs separately for EPA remedial actions identified in separate decision documents), *modification denied*, 2006 WL 2845763 (D.N.J. Sept. 29, 2006) (rejecting the Tenth Circuit's reasoning in *Colorado v. Sunoco*, Inc., 337 F.3d 1233, 1241 (10th Cir. 2003)), *amended on other grounds on reconsideration*, 2007 WL 1038593 (Mar. 30, 2007).

Raytheon argues that the United States' claim is barred by the statute of limitations, because the deadline to file would have run in 2001, nine years before the remedy was even selected in the 2010 ROD. Raytheon's narrow interpretation reaches a result which frustrates the purposes of CERCLA. *One Wheeler Rd. Assocs. v. Foxboro Co.,* 843 F. Supp. 792, 795 (D. Mass. 1994) ("CERCLA should be given a broad and liberal construction, and should not be narrowly interpreted to frustrate the government's ability to respond promptly, or to limit the liability of those responsible for cleanup costs beyond the limits expressly provided." (citations omitted)).

In contrast, the broader, more holistic application of CERCLA adopted by the Ninth Circuit in *Neville* is consistent with the statute's purposes. *See California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661 (9th Cir. 2004). Unlike some courts, which parse isolated segments of the statute, the *Neville* Court reads the statute as a whole. *Id.* at 666. Whereas the cases which Defendant cites read out the words and concept of "remedial action" and focus solely on the "initiation of physical on-site construction," the *Neville* Court combines the plain meaning of "remedial" with the relevant statute of limitations; concluding that "'the initiation of physical on-site construction of the remedial action' can only occur after the final remedial action plan is adopted." *Id.* at 667.

The facts in *Neville* are similar to the facts here. *Neville* dealt with contaminated groundwater. After a cleanup order from the state, Neville Chemical Company developed, and after state approval, implemented a groundwater containment and treatment system as an interim removal action. Furthermore, at the time the removal action was being designed, it was known that it could later be incorporated into a remedial action, should the system prove effective after implementation and testing. Later, after demonstrated efficacy, the development and selection of a remedial action, public comment, and the issuance of a remedial action plan ("RAP"), the

"groundwater containment and treatment system originally designed as an interim removal action remained part of the final RAP." *Id.* at 665.

Like *Neville*, the remedial action in this case incorporated a previously implemented interim removal action, the pump and treat system. Ex. B-6, p. 274-275 of 387 (Docket 11-2). Like *Neville*, the pump and treat system had been effectively operating with demonstrated success over time and was one component of a multi-component remedy.[23]

Thus, Raytheon's argument that the construction of the pump and treat system in 1995 initiated the remedial action which was not selected until 2010 is incorrect. *See Geraghty*, 234 F.3d at 926-927 (finding that certain wells dug for assessing contaminants and investigating water quality during the second phase of response activities at a site were removal activities under CERCLA, despite the third phase involving remedial activities that were later adopted in a final decision by the state regulator.). Essentially, only after the remedy is selected *and* on-site construction is begun can the statute of limitations begin to run.

Thus, for the reasons presented above, Raytheon has failed to carry its burden of demonstrating that the United States' Complaint in this matter is untimely.

## IV.  CONCLUSION

The United States respectfully requests that the Court deny Defendant Raytheon's Motion to Dismiss.

---

[23] Raytheon relies on dicta from this District's recent decision in *U.S. v. Boston & Maine Corp.,* No. 13-cv-10087, 2016 WL 5339573 (D. Mass. Sept. 22, 2016).  Such reliance is misplaced.  In *Boston & Maine*, this Court ruled in favor of the United States on a motion for partial summary judgment, holding that the United States' claim was timely and that the statute of limitations did not begin to run for a removal action until the ROD in that matter was issued.  *Id.* at *15-16. ("The overwhelming majority of cases addressing the issue find a removal action to be complete when final monitoring or evaluation is done, a ROD is issued, or some determination is reached that no further action is necessary." (internal citations omitted)).

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ANDREW S. LILLING
Acting United States Attorney
District of Massachusetts

ANNAPURNA BALAKRISHNA
(Bar No. 655051MA)
Assistant United States Attorney
District of Massachusetts
Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel: (617) 748-3111
Fax: (617) 748-3974
Email: annapurna.balakrishna@usdoj.gov

*/s/ Patrick M. Casey*
PATRICK M. CASEY (Bar No. 731048FL)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resource Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-1448
Fax: (202) 514-0097
Email: patrick.casey@usdoj.gov

BRADLEY L. LEVINE (Bar No. 974925DC)
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resource Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-1513
Fax: (202) 616-2427
Email: bradley.levine@usdoj.gov

21

OF COUNSEL:

Gregory Birkenstock
Naval Litigation Office
Office of General Counsel
Department of the Navy
720 Kennon Street, S.E.
Building 36, Room 233
Washington, DC 20374-5013

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed through the CM/ECF system and will be sent electronically to any registered CM/ECF participants on this 10th day of January, 2018.

/s/ Patrick M. Casey
U.S. Department of Justice